IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WAR N. MARION,

                   Plaintiff,                            OPINION and ORDER

           v.                                 07-cv-243-bbc

DYLON RADTKE, JANEL NICKEL
and CHAD KELLER,[1]

                   Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      The question in this prisoner civil rights case is whether plaintiff War N. Marion has

adduced sufficient evidence to allow a reasonable jury to find that defendants Dylon Radtke,

Janel Nickel and Chad Keller violated his right to due process in the context of disciplinary

proceedings that resulted in a punishment of 240 days in disciplinary segregation. Because

I conclude that plaintiff has failed to meet his burden, defendants' motion for summary

judgment will be granted. In addition, I will deny as unnecessary defendants' motion to

strike various materials that plaintiff filed several weeks after briefing was complete on

---

[1] In his complaint plaintiff identified defendant Janel Nickel as "Janel Nichols" and
defendant Chad Keller as "Lt. Keller." I have amended the caption to reflect the defendants'
full and correct names as identified in defendants' summary judgment submissions.

defendants' motion for summary judgment.  Even if I consider those materials, they do not have any effect on the case.

From the parties' proposed findings of fact and the record, I find that the following facts are undisputed.

## UNDISPUTED FACTS

### A.  Disciplinary Proceedings for Alleged Misconduct

Plaintiff War Marion is incarcerated at the Columbia Correctional Institution in Portage, Wisconsin.  On December 7, 2006, correctional officer Garrison issued a conduct report to plaintiff, alleging that he had observed plaintiff "with clenched fists yelling, 'I punch you in your bitch ass head'" at another prisoner.  Garrison charged plaintiff with making threats and engaging in disruptive conduct in violation of Wis. Admin. Code §§ DOC 303.16 and 303.28.  (Plaintiff disputes the facts underlying the conduct report, but he does not dispute what the conduct report says.  The parties also dispute whether defendant Janel Nickel, the security director, approved the conduct report.)

On December 8, 2006, plaintiff received a copy of the report.  In addition, he received a form titled "Notice of Major Disciplinary Hearing Rights and Waiver of Major Hearing and Waiver of Time."  The form notified plaintiff that his charges had been designated as a major offense and that he had the right to respond to the charges at a

disciplinary hearing, where he would have the right to present evidence and question witnesses.  Plaintiff refused to sign the notice.

In a note to the disciplinary committee dated December 12, plaintiff's staff advocate, Mary Leiser, wrote that she had offered plaintiff an "Offender's Request for Attendance of Witness" form and informed him of the two-day time limit to return a completed form to the security officer and the tentative date of the hearing, December 18.  Plaintiff submitted a written request for two prisoner witnesses (Toni Cayton and Michael Rowe) and two staff witnesses (Captain Winslow-Stanley and Andrea Nelson.)  Under the heading "Reason Why Testimony Is Essential," plaintiff wrote nothing.

Defendant Dylon Radtke, a supervising officer, reviewed plaintiff's request.  Radtke granted plaintiff's request with respect to the two prisoner witnesses but denied the request for the two staff witnesses, citing Wis. Admin. Code § DOC 303.81, which states that, "[e]xcept for good cause, an inmate may present no more than 2 witnesses in addition to the reporting staff member or members."  Defendant Nickel did not participate in the decision regarding which witnesses plaintiff should be allowed to call.  (Plaintiff disputes this fact, but cites no evidence in support of a contrary finding.)

The disciplinary hearing was held on December 18.  Leiser informed the disciplinary committee, including defendant Chad Keller, that plaintiff refused to attend the hearing. (Plaintiff denies that he told Leiser he refused to attend the hearing.)  The hearing proceeded

3

without plaintiff, but neither Keller nor Leiser chose to ask plaintiff's witnesses any questions.  Relying on Garrison's conduct report, the committee found plaintiff guilty of making a threat and engaging in disruptive conduct and sentenced him to 240 days of disciplinary separation and 15 days of loss of recreation.  Defendant Nickel did not participate in this decision.  (Plaintiff disputes this fact but cites no evidence in support of a contrary finding.)

Plaintiff appealed the decision on the grounds that he was "denied [his] due process right by staff not coming to get me for my full due process hearing" and by "denying [his] eyewitness (Dr. A. Nelson psychologist)."  The warden affirmed the committee's decision, concluding that Garrison had no reason to lie about the incident and that Leiser had informed the committee that plaintiff had refused to attend the hearing.

At the time he received the conduct report, plaintiff was housed in the disciplinary segregation 2 unit.  As a result of the conduct report, he was moved to the disciplinary segregation 1 unit.

B.  Conditions in Segregation

Columbia Correctional Institution has three segregation units:   disciplinary segregation 1, or "DS-1," disciplinary degregation 2, or "DS-2" and HU-7, which is in the Special Management Complex.  Prisoners assigned to segregation begin in DS-1.  The

4

prisoner proceeds to DS-2 when he "has demonstrated he can maintain appropriate behaviors." HU-7 "serves a variety of purposes," but most of the prisoners there are mentally ill or otherwise vulnerable.

1. Disciplinary segregation 1

In DS-1, a prisoner may not bring any property with him other than eye glasses and a wedding ring. Prisoners are issued underclothing, "segregation pants," t-shirts, tennis shoes, toothpaste and soap. They may not possess more than one t-shirt, one pair of pants, one pair of socks, one pair of underwear, one towel, one washcloth, one handkerchief and one set of thermal underwear at a time. In addition, prisoners are allowed the following property:

- Toilet Articles: one chapstick, one conditioner, one deodorant one shampoo one shaving cream, one skin lotion, two bars of soap, one soap dish, one roll of toilet paper, one toothbrush, one toothbrush holder and one tube toothpaste.

- Writing Supplies: one address book, 10 sheets carbon paper, one dictionary, three greeting cards, a reasonable amount of legal envelopes, two pen inserts, 25 stamped or blank envelopes and 100 sheets of stationary paper.

- Reading Materials: six books, one chapel library book, legal material (within fire-safety standards 20"x20"x20"), two library/school books, four magazines, four newspapers and 15 personal letters.

- Miscellaneous: one comb, one cup, one hairbrush, ten photographs, one pick, one deck of playing cards, one pair shower thongs and one calendar.

5

Prisoners are allowed two showers a week. They receive a new toothbrush four times a year.  Cells are cleaned twice a week.

Prisoners are allowed two hours of visits each month for the first 200 days and four hours a month thereafter.  These visits may be in one or two hour increments.   Prisoners are permitted one personal phone call a month after they have been in disciplinary segregation status for 30 consecutive days.

Exercise is offered four times each week for one hour at a time.  (The parties do not describe the form of exercise that is offered.)


2.  Disciplinary segregation 2

Prisoners in DS-2 receive all of the privileges and property that prisoners in DS-1 receive.  In addition, they are permitted razors, an additional shower each week, an extra hour of exercise, an additional four to ten hours of visits each month and an additional one or two phone calls each month.  Also, they are allowed to have a radio or tv if they are on "step 3" or higher and may keep a "reasonable" amount of nonperishable food in their cells.


3.  Administrative confinement

Prisoners may be placed in administrative confinement after serving sentences for program segregation or disciplinary separation. Administrative confinement consists of four

6

steps.  Prisoners in step one are housed in disciplinary segregation 1 and have the same property and privileges as those prisoners, with the exception that they are allowed three visits each month.  Prisoners in steps 2 and 3 are housed in the disciplinary segregation 2 unit and have same privileges as prisoners in step 1, with the exception that they are allowed one hour in the dayroom each week.  Prisoners in step 4 may be permitted to have "contact" visitation.

### C.  Procedural History of the Case

Plaintiff brought this case under 42 U.S.C. § 1983 in 2007, contending that various defendants denied him due process in the context of the disciplinary proceedings.  In a screening order, dkt. #3, I concluded that plaintiff had failed to state a claim upon which relief could be granted on the ground that placement in segregation did not qualify as a deprivation of liberty under the due process clause, as interpreted by the Supreme Court in Sandin v. Connor, 515 U.S. 472 (1995).  On appeal, the sole issue considered by the Court of Appeals for the Seventh Circuit was whether 240 days in disciplinary segregation was insufficient as a matter of law to qualify as a deprivation requiring due process.  The court of appeals reversed, concluding that factfinding was needed.  Marion v. Columbia Correctional Institution, 559 F.3d 693 (7th Cir. 2009).

On remand, I rescreened the complaint, dkt, #14, to address the remaining issues not

7

addressed by the court of appeals. I allowed plaintiff to proceed on a claim that defendants Janel Nickel and Dylon Ratdke had refused arbitrarily to allow him to call two staff members as witnesses and a claim that defendant Keller had refused to allow plaintiff to appear at the hearing.   However, I dismissed the complaint as to several other defendants because plaintiff's allegations did not state a claim against those defendants, even if I assumed that plaintiff was entitled to due process protections before being placed in segregation.   In addition, I recruited counsel for plaintiff under 28 U.S.C. § 1915(e)(1).  Dkt. #25.

Several months later, counsel moved to withdraw from the case.  Dkt. #29.  I granted the motion after a telephone conference because plaintiff made it clear that he was unwilling to defer to his lawyers on matters of legal strategy.  Dkt. #33.  Although plaintiff filed a motion for my recusal, dkt. #41, which I denied, dkt. #43, he did not file another motion for appointment of counsel.  Plaintiff is now proceeding pro se.


OPINION

A.  <u>Did Plaintiff Suffer an Atypical and Significant Hardship?</u>

The first question is whether plaintiff's placement in disciplinary separation for 240 days is the type of deprivation that triggers the protections of the due process clause. Although the Fourteenth Amendment prohibits state government from "depriv[ing] any person of . . . liberty. . . without due process of law," not every restriction on freedom of

8

movement qualifies as a "depriv[ation]" of "liberty" under Supreme Court jurisprudence. When an individual is incarcerated and his liberty is already severely restricted, the types of deprivations that qualify are necessarily limited even further.

In <u>Sandin</u>, 515 U.S. at 484, the Supreme Court rejected the argument that "any state action taken for a punitive reason encroaches upon a liberty interest under the Due Process Clause."  Instead, the Court held that prisoners are entitled to process under the Constitution if the discipline they receive increases their duration of confinement or subjects them to an "atypical and significant" hardship.   If the discipline does not fall into one of these categories, a prisoner has no recourse under the due process clause, even if he did not receive a hearing or even if the charge against him was a lie.

In <u>Sandin</u>, 515 U.S. at 486, the Court held that the prisoner's placement in disciplinary segregation for 30 days "did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest."  The Court noted that "disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody" and that "the conditions at [the prison] involve significant amounts of 'lockdown time' even for inmates in the general population."  <u>Id.</u>   The Court of Appeals for the Seventh Circuit has stated that, after <u>Sandin</u>, "it becomes apparent that the right to litigate disciplinary confinements has become  vanishingly small." <u>Wagner v. Hanks</u>, 128 F.3d 1173, 1175 (7th Cir. 1997).

9

See also <u>Townsend v. Fuchs</u>, 522 F.3d 765, 771 (7th Cir. 2008) ("[W]e have concluded that inmates have no liberty interest in avoiding transfer to discretionary segregation—that is, segregation imposed for administrative, protective, or investigative purposes."); <u>Hoskins v. Lenear</u>, 395 F.3d 372, 374-75 (7th Cir. 2005) (prisoner not entitled to process for discipline of two months' segregation, loss of prison job,  loss of privileges and transfer).  In fact, neither side has cited any cases in which the court of appeals found at summary judgment that prison officials had violated a prisoner's right to due process by placing him in segregation.

Because of <u>Sandin</u> and other cases, I concluded when I screened plaintiff's complaint under 28 U.S.C. § 1915 that plaintiff's placement in segregation was not sufficient to trigger the protections of the due process clause.  Dkt. #3.   However, I also concluded that "there is room for debate among reasonable jurists whether 240 days in disciplinary separation is sufficient to trigger due process protections," dkt. #8, citing <u>Whitford v. Boglino</u>, 63 F.3d 527 (7th Cir. 1995), in which the court stated that an "extreme ter[m] of segregation" might be sufficient.

On appeal, the Court of Appeals for the Seventh Circuit concluded that dismissal was premature.  <u>Marion v. Columbia Correctional Institution</u>, 559 F.3d 693 (7th Cir. 2009). The court relied on <u>Wilkinson v. Austin</u>, 545 U.S. 209 (2005), in which the plaintiffs were prisoners challenging their transfer to a "super maximum" prison under the due process

10

clause.  The Court concluded that the conditions of confinement created an "atypical and significant hardship" under <u>Sandin</u> for the following reasons:

> almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room. Save perhaps for the especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities, but here there are two added components. First is the duration. Unlike the 30-day placement in Sandin, placement at OSP is indefinite and, after an initial 30-day review, is reviewed just annually. Second is that placement disqualifies an otherwise eligible inmate for parole consideration. <u>Austin I</u>, 189 F.Supp.2d, at 728. While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context. It follows that respondents have a liberty interest in avoiding assignment to OSP.

<u>Wilkinson</u>, 545 U.S. at 223-24.

In <u>Marion</u>, 559 F.3d at 697, the court read <u>Sandin</u> together with <u>Wilkinson</u> to stand for the principle "that disciplinary segregation can trigger due process protections depending on the duration and conditions of segregation." One could argue that placement in segregation for 240 days *always* triggers the protections of the due process clause because such a long term of solitary confinement goes beyond what an ordinary prison sentence would entail.  Cf. <u>Colon v. Howard</u>, 215 F.3d 227, 232 (2d Cir. 2000) (suggesting "bright-line rule that confinement in" segregation "of more than 180 days meets the <u>Sandin</u> standard).  However, the court of appeals rejected that approach when it held that "a term of segregation as lengthy as Mr. Marion's *requires scrutiny of the actual conditions of segregation*."

11

Marion, 559 F.3d at 698 (emphasis added).  Thus, even for long-term placements in segregation, the court must determine whether the conditions themselves are sufficiently severe to qualify as "atypical and significant."

In determining whether plaintiff was subjected to an "atypical and significant hardship," the threshold question is:  atypical and significant as compared to what?  In Sandin, the Court did not answer this question directly, but simply noted that the conditions in disciplinary segregation "mirrored those conditions imposed upon inmates in administrative segregation and protective custody" and that "the conditions at [the prison] involve significant amounts of 'lockdown time' even for inmates in the general population." Wilkinson, 545 U.S. at 223, provides little additional guidance because the Court concluded in that case that the conditions of confinement "impose[d] an atypical and significant hardship under any plausible baseline."  See also Lekas v. Briley, 405 F.3d 602, 608 (7th Cir. 2005) ("[W]hat continues to be perplexing is the comparison group against which the conditions of disciplinary segregation are to be compared.")

In Wagner, 128 F.3d at 1175, the court concluded that "the key comparison is between disciplinary segregation and nondisciplinary segregation rather than between disciplinary segregation and the general prison population."  The court went on to state that it did "not think that comparison can be limited to conditions in the same prison, unless it's the state's most secure one."  Id.  In other words, courts must look at the conditions of

12

segregation in other prisons within the state.  The court went as far as to suggest that "[t]he logic of <u>Sandin</u> implies that the conditions of . . . disciplinary segregation are atypical only if no prison in the United States to which he might be transferred for nondisciplinary reasons is more restrictive."  <u>Id.</u> at 1176.  However, in <u>Marion</u>, 559 F.3d at 698, the court did not embrace that view, but seemed to assume that the question is whether plaintiff's conditions were "harsher than the conditions found in the most restrictive prison in Wisconsin."  Of course, that raises the question of how courts or litigants are to determine what the "most restrictive prison" is.

Neither side adduced evidence about conditions of confinement in other prisons or of conditions in protective custody in the Columbia prison.  Rather, defendants argue that the proper comparison is between disciplinary segregation 1 and disciplinary segregation 2 because plaintiff was housed in disciplinary segregation 2 before he was transferred to disciplinary segregation 1 as a result of the conduct report in this case.  Unfortunately, defendants develop no argument in favor of this approach, which seems to be inconsistent with <u>Marion</u> and <u>Wagner</u>.  For his part, plaintiff adduced no evidence about his conditions of confinement and seemed to adopt defendants' view that the proper comparison is between disciplinary segregation 1 and disciplinary segregation 2.

To the extent plaintiff was required to show that the conditions of disciplinary segregation 1 were "atypical and significant" as compared to conditions of nondisciplinary

13

segregation in other prisons in Wisconsin, plaintiff has failed to meet that burden. Celotex Corp. v. Catrett, 477 U.S. 317 (1986) (on motion for summary judgment, it is plaintiff's burden to adduce evidence on each element of his claim; it is not defendant's burden to disprove it). However, even if I assume that the parties have identified the proper comparison, summary judgment in defendants' favor is still required. Plaintiff did not respond to any of defendants' proposed findings of fact regarding his conditions of confinement, so I must treat those facts as undisputed. Schmidt v. Eagle Waste & Recycling, Inc., 599 F.3d 626, 630-31 (7th Cir. 2010). The difference between disciplinary segregation 1 and disciplinary segregation 2 is not significant. Prisoners in disciplinary segregation 2 are entitled to a few additional privileges, but the physical conditions of confinement are essentially the same. Cf. Wagner, 128 F.3d at 1175 (differences in visiting privileges not sufficient to show "atypical and significant" hardship).

In his brief, plaintiff argues that disciplinary segregation 1 is "extremely cold" and that the beds are closer to the ground than in other segregation units. Plt.'s Br., dkt. #47, at 11. Because plaintiff did not include these allegations in an affidavit or other admissible evidence, I cannot consider them. A brief is not evidence. Box v. A&P Tea Co., 772 F.2d 1372, 1379 n.5 (7th Cir. 1985). Even if he had included the allegations in an affidavit, his statement that disciplinary segregation 1 is "extremely cold" is too vague to be probative on a motion for summary judgment. Hall v. Bodine Electric Co., 276 F.3d 345, 354 (7th Cir.

2002) ("It is well-settled that conclusory allegations . . . do not create a triable issue of fact.");
Drake v. Minnesota Mining & Manufacturing Co., 134 F.3d 878, 887 (7th Cir. 1998).
("Rule 56 demands something more specific than the bald assertion of the general truth of
a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing
the existence of the truth of the matter asserted.").   With respect to plaintiff's allegations
about the beds, I cannot conclude that the height of a bedframe is significant enough to
implicate a constitutional right.

Plaintiff cites United States ex rel. Smith v. Robinson, 495 F. Supp. 696, 702 (D.C.
Pa. 1980), for the proposition that prisoners have "a liberty interest in freedom from
arbitrary placement in segregated housing units," and Brown v. Plaut, 131 F.3d 163, 170,
(DC Cir. 1997), for the proposition that he "had a liberty interest in avoiding a higher
segregation status."   Plaintiff quotes Robinson correctly, but I may not follow Robinson
because it was decided long before Sandin and Marion and is inconsistent with those
decisions.  With respect to Brown, 131 F.3d at 172, that case cannot help plaintiff because
the court "express[ed] no opinion at this time as to whether Brown had a liberty interest in
remaining free of administrative segregation."  Accordingly, I must grant defendants' motion
for summary judgment.


B.  Did Plaintiff Receive the Process He Was Due?

15

For the sake of completeness, if I assume that plaintiff had met his burden to show that he was subjected to an atypical and significant hardship, the next question would be whether plaintiff received the process he was due.  Plaintiff argues that the process he received was deficient in two ways: (1) he was unable to call two staff members as witnesses; (2) he was unable to appear at the hearing or otherwise present his side of the story. (Plaintiff raises a number of other issues in his brief, but these are the only two on which he was allowed to proceed in March 1, 2009, screening order, so I have disregarded these other arguments.)

In the order screening plaintiff's complaint, I assumed that plaintiff was entitled to the process that prisoners are required to receive before they lose good time credits:  (1) advance (at least 24 hours before hearing) written notice of the claimed violation; (2) the opportunity to be heard before an impartial decision maker; (3) the opportunity to call witnesses and present documentary evidence (when consistent with institutional safety); and (4) a written statement by the fact finder of the evidence relied on and the reasons for the disciplinary action.  Wolff v. McDonnell, 418 U.S. 539 (1974); Scruggs v. Jordan, 485 F.3d 934, 939 (7th Cir. 2007).  This may have been a mistake.

In Wilkinson, the Court concluded that the full protections afforded when good time credits are revoked are not required in the context of a transfer to a supermaximum prison. The Court noted that the loss of liberty was less severe because the Court was not comparing

16

the difference between prison and freedom implicated by the loss of good time credits, but the incremental difference between different forms of incarceration.  Wilkinson, 545 U.S. at 225 ("Prisoners held in lawful confinement have their liberty curtailed by definition, so the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all."); id. at 228 (contrasting transfer to supermax prison with "revok[ing] good-time credits for specific, serious misbehavior").  Thus, in the context of a supermax transfer, the Court  concluded that prison officials satisfied due process if they provided the prisoner with notice of the reasons for the transfer and an opportunity to rebut those reasons. Id. at 226.  Officials did not have to provide the prisoner with the ability to question witnesses or provide a hearing at all.

Thus, to the extent that the nature of the deprivation is the controlling factor in determining what process is due, Wilkinson provides the standard in this case.  Under that standard, plaintiff would not be entitled to call *any* witnesses, much less the four witnesses of his choice.  But see Brown,131 F.3d at 170 (assuming that Wolff standard applies to all disciplinary hearings).  However, even if Wolff applies, that would not mean that plaintiff was entitled to call any witness of his choice.  "Prison officials are afforded discretion to deny witnesses in order to keep disciplinary hearings within reasonable limits, because the witness may create a risk of reprisal, undermine authority or otherwise threaten institutional security, or because the witness's testimony would be irrelevant or cumulative."  Marion v.

17

Columbia Correctional Institution, No. 07-C-243-C, 2009 WL 1181255 (W.D. Wis. May 1, 2009)(citing Wolff, 418 U.S. at 566; Redding v. Fairman, 717 F.2d 1105, 1114 (7th Cir. 1983)).

In this case, defendant Radtke allowed plaintiff to call two prisoner witnesses, but denied his request to call to two additional staff witnesses under Wis. Admin. Code § DOC 303.81, which states that, "[e]xcept for good cause, an inmate may present no more than 2 witnesses in addition to the reporting staff member or members."  Because the rule is directed at preventing cumulative testimony, I cannot say that it is unreasonable on its face. Although plaintiff argues now that one of his requested witnesses, Andrea Nelson, was an eye witness to the incident, he did not explain that in his written request, even though there was a space for him to explain why the witness's testimony was important.  Defendants cannot be held liable for failing to apply the "good cause" exception when plaintiff failed to provide a reason for requesting the witnesses.  Even in the context of a trial, a witness may be barred from testifying if the party presenting the witness does not show that the witness will offer relevant information.

Plaintiff seems to argue in his brief that Andrea Nelson was exempt from the two-person limitation because she was a "reporting staff member."  Although his argument is not clear, it seems to be that Nelson was the "real" reporting staff member because she was the eye witness to the incident, not officer Garrison.  However, even if I assumed for the purpose

18

of summary judgment that Garrison did not actually witness the incident, it is undisputed that he wrote the conduct report, not Nelson.  Thus, regardless who witnessed the incident, Garrison is the "reporting" staff member under Wis. Admin. Code § DOC 303.81.

With respect to plaintiff's claim that he was the denied the right to be present at his hearing, the parties dispute whether plaintiff refused to attend the hearing and thus waived his right to be present.  Domka v. Portage County, Wisconsin, 523 F.3d 776, 781 (7th Cir. 2008) ("It is without question that an individual may waive his or her procedural due process rights.").  However, even if I assume that plaintiff wanted to be present, that does not mean that any of the defendants may be held liable under § 1983.  To be entitled to damages under § 1983, the plaintiff must prove that each defendant was personally involved in the alleged constitutional violation.  Morfin v. City of East Chicago, 349 F.3d 989, 1001 (7th Cir. 2003).  That means that one official may not be held liable for the violation of another official simply because of a supervisory relationship.  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1948 (2009).

In this case, plaintiff has adduced no admissible evidence that defendants Nickel and Radtke had any involvement in the disciplinary hearing.  With respect to defendant Keller, it is undisputed that he relied on the staff advocate, Mary Leiser, who told Keller that plaintiff refused to come.  Plaintiff has not provided any reason that Keller should have doubted Leiser's representation.  Plaintiff faults Keller for not asking the plaintiff himself

19

whether he wished to attend the hearing, but that is a claim of negligence, which is not enough to sustain a due process claim.  Gayton v. McCoy, 593 F.3d 610, 623 (7th Cir. 2010) ("[N]egligence  is not actionable as a due process violation.")

Mary Leiser is not a defendant in this case.  Plaintiff initially sued her (under the name "Mary Peiser") for failing to provide with him with an adequate defense, but I dismissed that claim in the May 1, 2009 screening order on the ground that plaintiff's allegations did not support a finding that plaintiff was entitled to a staff advocate, much less an effective one.  Wolff, 418 U.S. at 570 (concluding that prisoners do not have "a right to either retained or appointed counsel in disciplinary proceedings," but staff advocate may be appropriate "[w]here an illiterate inmate is involved . . . or the complexity of the issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case.")  Plaintiff did not allege that Leiser should be held liable for lying about plaintiff's wishes to attend the hearing.  Further, after I allowed plaintiff to proceed on a claim that Keller and Nickel refused to allow plaintiff to attend the hearing, he did not argue in his lengthy motion for reconsideration that I had misconstrued that claim by omitting Leiser.  Thus, even if I assume that plaintiff's due process rights were implicated by his placement in segregation, he could not prevail in an action for damages under § 1983.

20

ORDER

IT IS ORDERED that

1.  The motion for summary judgment filed by defendants Dylon Radtke, Janel Nickel and Chad Keller, dkt. #34, is GRANTED.

2.  Defendants' motion to strike, dkt. #57, is DENIED as unnecessary.

3.   The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered this 11th day of June, 2010.

BY THE COURT:

/s/

BARBARA B. CRABB
District Judge

21